1    **WO**

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                       FOR THE DISTRICT OF ARIZONA

8

9    Flint Wood, et al.,                    No. CV-12-08098-PCT-DGC

10                 Plaintiffs,              **ORDER**

11   v.

12   Thomas Betlach, Director of the Arizona
     Health Care Cost Containment System, and
13   Kathleen Sebelius, Secretary of the United
     States Department of Health and Human
14   Services, in their official capacities,

15                 Defendants.

16         Defendant Thomas Betlach is Director of Arizona's Medicaid program, known as

17   the Arizona Health Care Cost Containment System ("AHCCCS").  Defendant Kathleen

18   Sebelius ("the Secretary") is Secretary of the United States Department of Health and

19   Human Services ("DHHS"), which approves state Medicaid plans.  Plaintiffs are low

20   income residents of Arizona who qualify for medical assistance under a statewide,

21   Medicaid-approved demonstration project administered by AHCCCS.

22         The demonstration project provides coverage to low income childless adults who

23   would not otherwise be Medicaid eligible.  Patients in this "expansion population" are

24   subject to mandatory copayments for doctor's visits, non-emergency use of emergency

25   rooms, and prescription drugs.  These copayments, enacted under Arizona Administrative

26   Code Rule R9-22-711(F), are higher than the nominal copayments charged to low income

27   disabled individuals and families with dependent children – the "chronically needy"

28   population that states participating in Medicaid must cover.  Plaintiffs represent a class of

persons defined as "All Arizona Health Care Cost Containment System eligible persons in Arizona who have been or will be charged copayments pursuant to Arizona Administrative Code Amended Rule R9–22–711(F)."  Doc. 87.

Plaintiffs filed a complaint seeking declaratory and injunctive relief from these copayment requirements.   Doc. 1.   Plaintiffs allege that the requirements violate Medicaid's nominality limits and its prohibition on denial of services for inability to make copayments (*id.*, ¶¶ 2, 36, 37); that the Secretary exceeded her authority under 42 U.S.C. § 1315 when she granted approval to the heightened and mandatory copayments in the demonstration project and thereby violated the federal Medicaid Act and the Administrative Procedure Act ("APA") (*id.*, ¶¶ 60, 95-96); and that Director Betlach violated the due process requirements of the U.S. Constitution and the Medicaid Act when he sent legally insufficient notices to those subjected to the higher copayments (*id.*, ¶¶ 44, 99).

Plaintiffs filed a motion for class certification (Doc. 13) which the Court granted (Doc. 87), and a motion for preliminary injunction (Docs. 5) which the Court denied (Doc. 88).  The Court now has before it the Secretary's motion for summary judgment (Doc. 29), Plaintiffs' cross-motion for summary judgment (Doc. 67), and Director Betlach's cross-motion for summary judgment on Plaintiff's second claim for relief. Doc. 85.  These motions have been fully briefed.  Docs. 68, 89; 83, 89, 91, 96; 90, 100. The Court also has before it Plaintiffs' motion for judicial notice (Doc. 77), Director Betlach's response in opposition and cross-motion for judicial notice (Doc. 80), and Plaintiffs' reply (Doc. 81).   For the reasons stated below, the Court will deny the Secretary's motion for summary judgment, grant Plaintiffs' cross-motion for summary judgment on their first claim for relief, remand without vacatur the Secretary's approval of Arizona's demonstration project, deny Plaintiffs' motion for summary judgment on their second claim for relief, grant Director Betlach's motion for summary judgment on Plaintiffs' second claim for relief, and deny Plaintiffs' and Director Betlach's motions for

1  judicial notice.[1]

2  **I.    Background.**

3       **A.    Overview of the Medicaid Program.**

4       Congress created Medicaid in 1965 by adding Title XIX to the Social Security

5  Act, 42 U.S.C. §§ 1396-1396w-5.  Medicaid was enacted, in part, to enable states "to

6  furnish . . . medical assistance on behalf of families with dependent children and of aged,

7  blind, or disabled individuals, whose income and resources are insufficient to meet the

8  costs of necessary medical services."  42 U.S.C. § 1396-1.  States that wish to receive

9  federal funds through Medicaid must submit a state plan for approval by the Secretary of

10 DHHS.  *Id.* at § 1396a(a)-(b).   State Medicaid plans must cover those who are

11 "categorically needy" (those with dependent children who qualify for welfare, the

12 disabled, children, and pregnant women who qualify).  42 U.S.C. § 1396a(a)(10)(A)(i).

13 *Pharm. Research & Mfrs. of Am. ("PhRMA") v. Walsh*, 583 U.S. 644, 650-651, 651 n. 4

14 (2003).  States may additionally opt to cover the "medically needy" (those who meet the

15 non-financial eligibility requirements of Medicaid, but whose incomes exceed the

16 eligibility limits).  42 U.S.C. § 1396a(a)(10)(C); *see PhRMA* at 651 n. 5.   Unless

17 specifically waived, state plans must comply with all provisions of the Medicaid Act.

18 *Spry v. Thompson*, 487 F.3d 1272, 1273 (9th Cir. 2007); *see also Beno v. Shalala*, 30 F.

19 3d 1057, 1068 (9th Cir. 1994) ("While states are not required to participate in these

20 federal programs, if they elect to participate, compliance . . . is mandatory.")

21      Under Section 1115 of the Social Security Act, the Secretary of DHHS may waive

22 certain Medicaid Act requirements for an approved "experimental, pilot, or

23 demonstration project" that the Secretary finds "is likely to assist in promoting the

24 objectives of" the Medicaid Act.  42 U.S.C. § 1315.  Section 1115 demonstration projects

25

26      [1] Oral argument was scheduled for January 30, 2013, but was cancelled due to a
medical emergency in the family of the undersigned judge.  The Court does not have
27 room in its schedule for another oral argument before the month of April, and concludes
that the parties' briefs are sufficient for the Court to make a fully informed decision.  The
Court therefore issues this order without oral argument. Fed. R. Civ. P. 78(b).

28

may cover Medicaid ineligible populations – known as "expansion populations" – who are not covered under the state Medicaid plan. *Id.*; *Spry*, 487 F.3d at 1274-5. The waiver allows state expenditures for these projects to be counted as expenditures under the state plan for federal reimbursement purposes. 42 U.S.C. § 1315(a)(2)(A); *Spry*, 487 F.3d at 1277.

States are permitted, with some exceptions, to impose cost-sharing provisions for both the mandatory ("categorically needy") and optional ("medically needy") populations covered by Medicaid state plans. 42 U.S.C. § 1396o(a) & (b). These charges must be nominal in amount. *Id.* at § 1396o(a)(3) & (b)(3). *See Spry*, 487 F.3d at 1276. The nominality requirements do not apply to expansion populations. *Id.*, *Newton-Nations v. Betlach*, 660 F.3d 370, 379-80 (9th Cir. 2011).

### B. Arizona's Medicaid-Funded Plans.

Arizona participates in Medicaid through AHCCCS. Docs. 16 at 11, 39 at 7; A.R.S. §§ 36-2901-2972. AHCCCS administers Arizona's state Medicaid plan, its demonstration projects, and certain state-only initiatives. Doc. 39 at 6-7.

In November 2000, Arizona citizens passed Proposition 204, which required the state to expand AHCCCS coverage to all persons with incomes below the federal poverty level ("FPL"). Doc. 16 at 13; A.R.S. § 36-2901.01. In 2001, the state received approval from DHHS for a demonstration project under Section 1115. Doc. 16 at 13. The Secretary's approval allowed the state to provide federally-reimbursed AHCCCS coverage to individuals below the FPL who did not have dependent children living with them – the expansion population referred to as "childless adults" – who would not otherwise be Medicaid eligible under a state plan. *Id.*; Doc. 39 at 7.

AHCCCS beneficiaries covered as part of this "expansion population" were charged the same nominal copayments as regular Medicaid recipients – $1.00 per doctor's visit, $5.00 for nonemergency use of emergency rooms, and $5.00 for nonemergency surgery. Doc. 16 at 13; Ariz. Admin. Code R9-22-711(A). The plan prohibited health care providers from refusing services to those who could not make the

copayments.  Ariz. Admin. Code R9-22-711(B).

In 2003, Arizona implemented the Copayment Rule and increased copayments for those in the expansion population.  Doc. 16 at 14; Ariz. Admin. Code R9-22-711(E).  The Copayment Rule gave medical providers discretion to refuse services to members of the expansion population who failed to pay the increased copayments.  *Id.*  Arizona applied for and received approval from the Secretary of DHHS for this modification to its demonstration project.  Doc. 39 at 7.  The Copayment Rule, which was then found at Arizona Administrative Code R9-22-711(E), required members of the expansion population to pay $4.00 for every generic prescription or brand name prescription where no generic drug is available, $10.00 for every brand name prescription when a generic drug is available, $5.00 for every physician office visit, and $30.00 for non-emergency use of an emergency room.  Doc. 16 at 14.  The Secretary's approval for the 2001 demonstration project expired in 2006, but the Secretary approved an additional five-year demonstration project that included the Copayment Rule (renumbered to Rule R9-22-711(F)).  Docs. 16 at 14; 39 at 7.

The demonstration project was scheduled to expire on September 30, 2011.  As a result, the State wrote to the Secretary on March 31, 2011, and asked her to approve "a new Section 1115 Research and Demonstration Project Waiver . . . for the period of October 1, 2011, through September 30, 2016."  AR 004219.  The proposed new project covered the childless adult population covered by the previous demonstration project, but with enrollment frozen at lower levels.  *Id.* at 004220.  It also included the Copayment Rule, renumbered to R9-22-711(F), as well as other modifications to the program.  *Id.*; *Id.* at 000018.  The Secretary approved the new demonstration project on October 21, 2011.  *Id.* at 000001-5.  The project was approved until 2016, with the Copayment Rule effective until December 31, 2013.[2]  *Id.*; *Id.* at 000033.

---

[2] The federal Affordable Care Act is set to go into effect on January 1, 2014.  As of that date, all those with incomes below the FPL will become a mandatory Medicaid

Plaintiffs brought this lawsuit on the basis of the Secretary's October 21, 2011 decision, but they purport to challenge only the Copayment Rule portion of that decision. In other words, Plaintiffs ask the Court to vacate the Copayment Rule and leave the rest of the Secretary's decision and the demonstration project in place.

### C. *Newton-Nations* Litigation.

Following the Secretary's 2003 approval of the Copayment Rule, which modified the 2001 demonstration project by increasing copayments for the childless adult population, several plaintiffs who were part of this expansion population brought suit challenging the Secretary's approval of the increased copayments as arbitrary and capricious and in violation of the Medicaid Act.  *See Newton-Nations v. Rogers*, 221 F.R.D. 509, 510 (D. Ariz. 2004).  Judge Earl H. Carroll granted the plaintiffs' motion for class certification, with the class defined as "all Arizona Health Care Cost Containment eligible persons in Arizona who have been or will be charged copayments pursuant to Arizona Administrative Code Amended Rule R9-22-711(E)." *Id.* at 512.  Judge Carroll granted the plaintiffs' request for a preliminary injunction and enjoined the state from imposing the higher copayments or allowing medical providers to refuse services for inability to pay.  *Newton-Nations v. Rogers*, 316 F. Supp. 2d 883, 891 (D. Ariz. 2004). The injunction was lifted on March 29, 2010, when Judge Carroll granted summary judgment in favor of the defendants.  *Newton-Nations v. Rogers*, No. CV 03-2506-PHX-EHC, 2010 WL 1266827 at *21 (D. Ariz. March 29, 2010).

The Ninth Circuit affirmed Judge Carroll's decision in part and reversed it in part. *Newton-Nations  v. Betlach*, 660 F.3d 370, 383-84 (9th Cir. 2011).  The Court of Appeals found that Judge Carroll had properly granted summary judgment in favor of the defendants and against the plaintiffs on the claim that the then-Secretary violated the Medicaid Act and the APA when he determined that a waiver of the copayment

---

population. 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII). AR 000036-37. (Section 36(b)).

requirement was not required for Arizona's expansion populations.  *Id.* at 379-80.  The Court of Appeals found that the Secretary had reasonably interpreted the Medicaid Act to mean that persons not covered by the state Medicaid plan "are expansion populations not protected by the § 1396o cost-sharing limits."  *Id.* at 379. [3]  The Ninth Circuit reversed the grant of summary judgment in favor of defendants on the claim that the Secretary's approval of the increased copayments was arbitrary and capricious, finding that "[t]he administrative record does not demonstrate that the Secretary made the requisite findings required by *Beno*."  *Id.* at 381 (citing *Beno v. Shalala*, 30 F.3d 1057 (2011)).  The Ninth Circuit found "no evidence that the Secretary made 'some judgment that the project ha[d] a research or a demonstration value.'"  *Id.* (quoting *Beno*, 30 F.3d at 1069).  The Ninth Circuit remanded to the district court with instructions to vacate the Secretary's decision and remand to the Secretary for further consideration.  *Id.* at 382.

On remand, Judge Rosslyn O. Silver found the case moot because the Secretary's 2003 approval of the Copayment Rule had expired and "the copayments currently in effect are due to a *new* program based on a *new* administrative record."  *Newton-Nations v. Betlach*, 03-02506-PHX-ROS, Doc. 261 at 4 (emphasis in original).  Judge Silver stated that the plaintiffs could file a new suit on the new record.  *Id.*  Plaintiffs promptly filed this action.  Doc. 1.

---

[3] The argument the plaintiffs raised before the Ninth Circuit was more nuanced than the one made before Judge Carroll.  Judge Carroll had found on the basis of the Ninth Circuit's ruling in *Spry* that because the plaintiffs were part of an expansion population and not covered by Arizona's state Medicaid plan, there was no need for the Secretary to waive the Medicaid Act's copayment limitations in order to approve the higher than nominal copayments at issue.  *Newton-Nations*, 2010 WL 1266827 at *13, *15; *see Spry*, 487 F.3d at 1276.  The plaintiffs appealed on the basis that some plaintiffs qualified as "medically needy," and they argued that Medicaid's copayment limitations therefore applied to them because they *could* be covered as Medicaid-eligible individuals, even though Arizona had opted not to cover the "medically needy" population under its state plan.  *Newton-Nations*, 660 F.3d at 378.  The Ninth Circuit found that Congress had not spoken directly to this issue and therefore deferred to the Secretary's interpretation that "where, as here, a state has not defined its 'medically needy' population pursuant to the Medicaid Act, persons who are not mandatorily covered by the state plan are expansion populations not protected by the § 1396o cost-sharing limits."  *Id.* at 379-80.

1    **II.    Legal Standards**

2        **A.    Standard of Review.**

3        Under the APA, a reviewing court must hold unlawful and set aside agency action

4    found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

5    with law[.]" 5 U.S.C. § 706(2)(A).  A decision is arbitrary and capricious if the agency

6    "has relied on factors which Congress has not intended it to consider, entirely failed to

7    consider an important aspect of the problem, offered an explanation for its decision that

8    runs counter to the evidence before the agency, or is so implausible that it could not be

9    ascribed to a difference in view or the product of agency expertise."  *O'Keeffe's, Inc. v.*

10   *U.S. Consumer Prod. Safety Comm'n*, 92 F.3d 940, 942 (9th Cir.1996) (quoting *Motor*

11   *Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The

12   standard is deferential.  The Court may not substitute its judgment for that of the agency.

13   *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir.2010).

14       **B.    Summary Judgment Standard.**

15       A party seeking summary judgment "bears the initial responsibility of informing

16   the district court of the basis for its motion, and identifying those portions of [the record]

17   which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex*

18   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Summary judgment is appropriate if the

19   evidence, viewed in the light most favorable to the nonmoving party, shows "that there is

20   no genuine dispute as to any material fact and the movant is entitled to judgment as a

21   matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is also appropriate against a

22   party who "fails to make a showing sufficient to establish the existence of an element

23   essential to that party's case, and on which that party will bear the burden of proof at

24   trial."  *Celotex*, 477 U.S. at 322.  Only disputes over facts that might affect the outcome

25   of the suit will preclude the entry of summary judgment – the disputed evidence must be

26   "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

27   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

28

**III.     The Secretary's Motion for Summary Judgment.**

Approval of a demonstration project under Section 1115 requires that the Secretary examine three issues: "first, whether the project is an 'experimental, pilot or demonstration project.'  Second, whether the project is 'likely to assist in promoting the objectives of the act.'  Third, 'the extent and period' for which she finds the project is necessary."  *Newton-Nations*, 660 F.3d at 380 (quoting *Beno*, 30 F.3d at 1068-71) (internal citations and initial capitals omitted).  The Secretary seeks summary judgment on Plaintiffs' first claim for relief, arguing that she considered each of these factors and reasonably determined that the demonstration project could yield useful information for demonstration purposes, serves the objectives of the Medicaid Act by providing coverage to those who would not otherwise be entitled to federally-funded medical assistance, and is limited in extent and duration.  Doc. 30 at 3.  The Secretary argues that § 1315 requires no more.  *Id.*, *id.* at 16.

As an initial matter, Plaintiffs' repeatedly assert on the basis of *Newton-Nations* that the Secretary's approval can only be upheld if the copayments, viewed in isolation, satisfy each of the three prongs under the Medicaid Act, and that it is impermissible for the Secretary to base her considerations of these factors upon the demonstration project as a whole.  *See, e.g.*, Doc. 76 at 12, 14, 15.  The Court does not agree.

In *Newton-Nations*, the Ninth Circuit applied the three-pronged analysis specifically to the Secretary's approval of Arizona's Copayment Rule, finding inadequate the Secretary's discussion on the record as to "why the copayments were approved."  660 F.3d at 381.  In finding that the Secretary had failed to make "'some judgment that the project has a research or a demonstration value'" (*Beno,* 30 F.3d at 1069), the court noted the Secretary's failure to show that the project's copayment provisions would reveal anything new for demonstration purposes.  *Id.*  But as the Court previously discussed in its order denying Plaintiffs' motion for preliminary injunction (*see* Doc. 88 at 9), the only issue before the Ninth Circuit in *Newton-Nations* was the Secretary's 2003 approval of the Copayment Rule.  The Section 1115 demonstration project, which had been approved

by the Secretary in 2001, was not at issue.  Here, by contrast, the Copayment Rule has not been approved separately.  The Secretary decided on October 21, 2011 to approve a "new Section 1115 Demonstration" that included far more than just increased copayments.  *See* Doc. 32-1 at 4.  Plaintiffs' argument that the timing of the Secretary's approval does not change the legal requirements of what she must consider ignores the fact that what the Secretary was asked to approve in 2003 is materially different from the new demonstration project the Secretary was asked to approve in 2011.  The Court is not persuaded that copayments challenged as part of a larger demonstration project must independently merit approval under Section 1115.  To so hold would mean that any provision of a larger demonstration project could be challenged as not independently warranting approval under Section 1115, notwithstanding that provision's relationship to and interaction with the project as a whole.  *Newton-Nations* does not compel such a result.

The statutory language of Section 1115, and the Ninth Circuit's opinion in *Beno*, upon which *Newton-Nations* relied, do not require such myopic analysis.  Section 1115(a) refers to whether the "experimental, pilot, or demonstration *project*" is, in the judgment of the Secretary, likely to further the objectives of the Medicaid Act.  42 U.S.C. § 1315(a) (emphasis added).  In applying this section, *Beno* stated that the Secretary must determine "that *the project* has a research or demonstration value" and that "*the proposed project*" is likely to promote the objectives of the Act.  30 F.3d at 1069 (emphasis added).

*Beno* also presented different facts than those presented here.  *Beno* dealt with the Secretary's grant of a waiver allowing California to reduce its statewide benefits to families with dependent children below statutorily-required levels as part of a purportedly experimental "work incentive" project.  *Id.* at 1060, 1061.  The court asked if the Secretary had considered whether the benefits cut served an experimental purpose and furthered the objectives of the Medicaid Act.  *Id.* at 1073-76.  But in *Beno*, California had hypothesized that the benefits cut would create work incentives – the purported purpose of the demonstration.  *Id.* at 1060-61.  Thus, the cut itself was integral to the project's

experimental purpose.  The benefits cut also applied to California residents who had a statutory right to greater benefits absent the Secretary's waiver.  *Id.* at 1061.  Thus, the issue presented in *Beno* was the lawfulness of the Secretary's waiver, for experimental purposes, of a discrete statutory provision mandating a minimum level of coverage.  *Id.* It was in this context that *Beno* focused on the benefits cut in particular.

In this case, the state has no obligation to provide benefits to expansion populations, and the Medicaid Act's limitations on copayments do not apply to the childless adult population.  *Spry*, 487 F.3d at 1276; *Newton-Nations*, 660 F.3d at 379-80. The relevant "waiver" allows the State to receive federal funds for extending benefits to a population which otherwise would not qualify for federal reimbursement.  *See Spry*, 497 F.3d at 1277.[4]   The imposition of copayments on the expansion population may be relevant or even central to the Secretary's consideration of the experimental purpose of the demonstration project and of its overall effectiveness in furthering the objectives of the Medicaid Act, but nothing in *Newton-Nations*, *Beno*, or the language of Section 1115 persuades the Court that compliance with Section 1115 must be found in the copayments alone rather than the demonstration project as a whole.

## A.   Is the Project an Experimental, Demonstration, or Pilot Project?

Congress enacted Section 1115 of the Social Security Act to ensure that certain of the Act's otherwise mandatory requirements did not "stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients."   S. Rep. No. 1589, 87th Cong., 2d Sess. 20, *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961, *cited in Beno*, 30 F.3d at 1069.  Thus, approval for a project under this provision requires the Secretary to "make some judgment that the project has a research or a demonstration value."  *Beno*, 30 F.3d at 1069.  The Ninth Circuit has

---

[4] This waiver has also been referred to as the Secretary's "expenditure authority" under Section 1115, as distinguished from the Secretary's "waiver authority" under that section with regard to other substantive provisions of the Medicaid Act.  Doc. 30 at 5-6; *see, e.g.*, AR 5020 (referring to expansion populations previously made eligible for coverage "through section 1115 expenditure authority.").

explained that a simple benefits cut unconnected to a research or experimental goal does not satisfy this requirement. *Id.* Instead, the Secretary "must make at least some inquiry into the merits of the experiment – she must determine that the project is likely to yield useful information or demonstrate a novel approach to program administration." *Id.*

The Secretary argues that she easily met this burden when granting approval to Arizona's demonstration project because she identified four elements of the project that would be tested with respect to the effects of copayments on the state's childless adult population. Doc. 30 at 19-20. These include:

> 1. Utilization of needed preventative, primary care, and treatment services;
>
> 2. Appropriate utilization of emergency room care, and appropriate cost and clinically effective use of generic and brand name drugs;
>
> 3. State and Federal expenditures (per enrollee) in the short and long term; and
>
> 4. Physician participation, including physician willingness to accept appointments from the adults without dependent children population."

Doc. 32-1 at 10, AR 000008; *see* Doc. 30 at 19.[5]

The Special Terms and Conditions ("STCs") included with the Secretary's approval letter further designate that Arizona must conduct an evaluation of the cost-

_____

[5] The Program Overview included in the Special Terms and Conditions of AHCCCS suggests that the demonstration project approved in this case has a broader experimental or demonstration purpose than simply testing the copayment-related factors the Secretary identifies. It states that all of AHCCCS was approved as a demonstration project that "provides health care services through a prepaid, capitated managed care delivery model that operates statewide for both Medicaid State plan groups as well as Demonstration expansion groups." AR 000008. For Medicaid-eligible groups, the project requires enrollment in the managed care system and thereby tests "the use of managed care entities to provide cost effective care and coordination." *Id.* By additionally covering expansion groups – including childless adults – for whom the state would not otherwise receive Medicaid assistance, the project also tests "the benefits of providing [the managed care approach] to a wider population." *Id.* The specific tests to which the Secretary points are said to be "in addition" to these demonstration purposes. *Id.* Because the Secretary points only to the experimental or demonstration purposes identified with respect to the copayments and other cost-sharing provisions, however, the Court will focus its discussion of the project's demonstration purposes on these factors.

sharing provisions of the project – including copayments for medical services and for taxi rides in Maricopa and Pima County for non-emergency medical transportation – in order to test the following hypotheses:

> i. How will utilization of needed preventive, primary care, and treatment services be affected;

> ii. To what extent will the imposition of the pharmacy co-payments and copayments related to non-emergent [sic] use of emergency rooms ensure appropriate utilization of emergency room care and appropriate utilization of cost and clinically effective generic and brand name drugs; and

> iii. Will the mandatory co-payments affect State and federal expenditures (per enrollee) in the short and long term; and

> iv. Will there be an impact on physician participation, or physician willingness to accept appointments from the adults without dependent children population.

AR 000018, 000032.   In addition to evaluating the copayments on the basis of these inquiries, the state was required to make a number of findings related to the program's permissible provider fee for missed appointments, such as whether the missed appointment fees reduced the number of missed appointments and whether missed appointments varied by provider type or region of the state.   AR 000033.

The statements in the Secretary's approval letter and the requirements set forth in the STCs amply demonstrate that the Secretary made at least "some judgment that the project has a research or a demonstration value." *Beno*, 30 F.3d at 1069.   The Secretary's finding that the project met this requirement may yet be "arbitrary and capricious," however, if the Secretary "entirely failed to consider an important aspect of the problem, offered an explanation for [her] decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *O'Keeffe's, Inc.*, 92 F.3d at 942.

Plaintiffs argue that the Secretary failed to consider or address substantial evidence showing that none of the project's identified hypotheses tests anything new for demonstration purposes.   Doc. 76 at 17-22.   Plaintiffs rely principally on a 2008 Second Declaration of Dr. Leighton Ku ("Ku Declaration"), first submitted in *Newton-Nations*, in

which Dr. Ku – Plaintiffs' expert on Medicaid and cost sharing – opined that numerous studies have looked at the effects of cost-sharing on the poor over the past 35 years, with the effects of copayments being "the most heavily studied[.]"  AR 003315, ¶ 9.  Based on his review of "ample research about the effects of copayments in Medicaid[,]" Dr. Ku opined that he was "not aware of any 'unique or untested' aspect of cost-sharing or copayments that would be examined under this project[.]"  AR 003322, ¶ 24.  Plaintiffs argue that Dr. Ku's Declaration applies equally to the copayments at issue in this case because they are the same copayments as approved in 2003.  Doc. 76 at 21.  Plaintiffs submitted Dr. Ku's opinion to DHHS in April of 2011 as part of their objection to AHCCCS's request for approval of the new demonstration project.  Plaintiffs argue that nothing in the administrative record shows that the Secretary considered Dr. Ku's opinion when granting approval to the demonstration project or that she relied on other expert opinions that disagreed with Dr. Ku when she made her decision.  *Id.*, at 17-21.

The Secretary argues that the Ku Declaration is irrelevant because it predates her approval of the challenged demonstration project by three years and applies to an earlier decision in which the research value of the demonstration project had not been discussed.  Doc. 30 at 20-21.  The Secretary also argues that the Ku Declaration does not refute the research value of the current demonstration project because Dr. Ku's opinion is limited to the general topic of the effect of copayments on low-income populations, and the current project's research aims are more targeted, including whether charging different copayments for generic and non-generic drugs or for doctor's office visits and non-emergency use of emergency room care will direct low income populations to more cost- and clinically-effective uses of prescription drugs and medical services.  *Id.* at 20.

The Court is not persuaded that the fact that the Ku Declaration relates to the 2003 copayments rather than the specific demonstration project at issue here makes it irrelevant to whether the Secretary "failed to address an important aspect of the problem" or "offered an explanation for [her] decision that runs counter to the evidence before the agency[.]"  *O'Keeffe's, Inc.*, 92 F.3d at 942.  Plaintiffs submitted the Ku Declaration to

DHHS as part of the administrative process and as evidence that studying the effects of copayments on the childless adult population would not produce any new information. Plaintiffs' administrative submission related to an important aspect of the Secretary's required analysis, namely, whether the project was approved for a demonstration or experimental purpose.  As the following discussion demonstrates, the Secretary was required to address Plaintiffs' submission and their contention that the opinion of Dr. Ku regarding the lack of experimental value of testing the 2003 copayments also applied in this case.[6]

In *Beno*, the Ninth Circuit found that evidence that the Department had put a good deal of thought into the research component of the project at issue was not sufficient to show that the Secretary had considered all relevant issues where the record contained no evidence that the Secretary or the State of California had considered or responded to the substance of the plaintiffs' administrative objections.  30 F.3d at 1075.  The Ninth Circuit distinguished *Aguayo v. Richardson*, 473 F.2d 1090, 1106 (2d. Cir. 1973), in which the Secretary sought additional information from the state in response to the plaintiffs' objections and provided a state memorandum addressing the plaintiffs' concerns.  30 F. 3d at 1074.  *Beno* found that "[t]he instant case contains no such memoranda, no request for additional information related to the project's impact on recipients, no statement explaining the need for a statewide benefits cut, and no indication that the Secretary had any information refuting plaintiffs' substantial documentary evidence[.]"  *Id.*

Here, as in *Beno*, the record contains no evidence that the Secretary considered or responded to Plaintiffs' substantive objections during the administrative process.  The Secretary points to two statements in the record from healthcare providers expressing

---

[6] Plaintiffs submitted to the Court two supplemental declarations of Dr. Ku that contained similar objections regarding the Secretary's October 21, 2011 approval of Arizona's Section 1115 demonstration project and responding to the declaration of Victoria Wachino (Doc. 89) that the Secretary submitted in response.  Docs. 51, 72. Because these declarations post-date the Secretary's decision and are not part of the administrative record, the Court will not address them.

1    support for the implementation of the proposed copayments (AR 003266, 003912), but

2    these statements do not relate to the objections made by Plaintiffs and therefore provide

3    no evidence that the Secretary considered these objections.  "[A] court should not infer

4    that an agency considered an issue merely because it was raised, where there is no

5    indication that the agency or other proponents refuted the issue." *Beno*, 30 F. 3d at 1074-

6    75; *see National Wildlife Fed'n v. FERC,* 801 F.2d 1505, 1512 (9th Cir.1986) (vacating

7    and remanding for further consideration of petitioners' objections where the agency

8    "simply did not mention the extensive and uncontradicted evidence offered by

9    petitioners" or explain its rejection of the options they proposed).

10          As evidence that she considered the relevant factors bearing on the project's

11   demonstration purpose, the Secretary cites the Declaration of Victoria Wachino, Director

12   of the Children and Adults Health Programs Group at the Centers for Medicare &

13   Medicaid Services (CMS) within DHHS.   Doc. 89 at 6-7.   Director Wachino is

14   responsible for overseeing and supervising the Division of State Demonstrations and

15   Waivers, which analyzes and processes state Section 1115 applications, and she was

16   involved in approving Arizona's demonstration project.  Doc. 66-1, ¶¶ 1-2, 5.  Director

17   Wachino affirms Dr. Ku's opinion that cost-sharing has been extensively researched, but

18   states that "[c]ontrary to Dr. Ku's belief, CMS believes that the hypotheses outlined in

19   the New Demonstration with respect to cost sharing may address existing gaps in or

20   otherwise strengthen the research literature and will render information useful in crafting

21   future public policy." Doc. 66-1, ¶¶ 12, 14.  The Wachino Declaration additionally cites

22   to the opinions of other experts lending support to the conclusion that Arizona's

23   demonstration project will yield useful information related to the use of copayments that

24   has not previously been studied. *Id.*, ¶¶ 15-16, 18-19.

25          The Secretary argues that the Court may consider Director Wachino's declaration

26   even though it is not part of the administrative record because it explains the Secretary's

27   decision.  Doc. 89 at 7, n. 3.  But even if the Wachino Declaration refutes the objections

28   raised by Plaintiffs, Director Wachino does not assert that the Secretary responded to

plaintiffs' objections during the administrative process or that the findings put forth in her Declaration entered into the agency's analysis prior to the Secretary's approval decision on October 21, 2011.

Additionally, even if the Court were to find, as the Secretary argues, that the research aims of the current demonstration project are sufficiently targeted to produce useful information not already available from the body of research reviewed by Dr. Ku, this is not for the Court to decide.  "The APA does not give this court power 'to substitute its judgment for that of the agency' but only to 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Beno*, 30 F.3d at 1073 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

The Secretary correctly maintains that "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."  Doc. 31 at 22 (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).  But the Secretary has not pointed to any expert opinion or evidence in the administrative record that refutes the objections put forth by Plaintiffs on the basis of Dr. Ku's research.  The Wachino Declaration may show after-the-fact that the Secretary's differing opinion is not "so implausible that it could not be ascribed to a difference in view or the product of agency expertise" (*O'Keeffe's, Inc.*, 92 F.3d at 942), but the Court "may not consider reasons for agency action which were not before the agency."  *Beno*, 30 F.3d at 1073 (citing *Bowen v. American Hosp. Ass'n*, 476 U.S. 610, 627 (1986)).  As discussed above, Director Wachino does not assert that the arguments and opinions she presents in her Declaration were considered by DHHS during the administrative process or that the agency relied on them when making its decision.  Although "the court will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned" *River Runner for Wilderness*, 593 F.3d at 1078 (internal quotation and brackets omitted), the record must be sufficient "to show that the agency has reviewed

the relevant factors." *Beno*, 30 F.3d at 1073 (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  Here, the administrative record provides no evidence that the Secretary considered plaintiffs' objections during the administrative process as she was required to do (*Beno*, 30 F.3d at 1075) or that she reasonably relied on her own expertise when she reached a conclusion that runs counter to the expert opinion submitted by Plaintiffs.

### B.       Will the Project Likely Assist in Promoting the Objectives of the Act?

The purpose of the Medicaid Act, as previously noted, is to enable states "to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396-1.  In furtherance of this purpose, Section 1115 waivers allow states to extend medical assistance to expansion populations. 42 U.S.C. § 1315(a)(2).  This includes the childless adult population at issue in this case.

The Secretary argues that she "'considered the impact of [Arizona's] project on the persons' the Medicaid Act 'was enacted to protect" as required under Ninth Circuit precedent.  Doc. 30 at 16 (quoting *Newton-Nations*, 660 F.3d at 381).  As evidence that she met this requirement, the Secretary points to the approval letter from CMS which states:

> Maintaining as much of the current coverage of the childless adult population as possible is an important feature of the Demonstration as it furthers the coverage objectives of the Medicaid program.  As such, we understand from the State that the imposition of the mandatory copayments on this population is necessary in order to prevent the State from implementing alternatives such as covering this population at a lower percentage of the Federal poverty level (FPL), a result that would jeopardize current coverage levels or result in diminished benefits for this population.

Doc. 39 at 16; Doc. 32-1 at 5, AR 3.  The letter goes on to explain that the demonstration project "is intended to increase access to care and improve quality of care for the State's population as a whole and for the expansion populations in particular."  Doc. 32-1 at 5, AR 000003.

1     Plaintiffs argue that the Secretary improperly considered cost-savings in violation
2   of *Newton-Nations* and *Beno* (Doc. 16 at 18, 19), but these cases did not hold that the
3   Secretary could not consider cost-saving measures when determining whether to grant
4   approval to a state demonstration project.  Rather, they stated that cost-savings do not
5   satisfy the requirement that the project be for an experimental purpose.  *See Newton-*
6   *Nations*, 660 F.3d at 380; *Beno*, 30 F.3d at 1071 (finding that "a simple benefits cut,
7   which might save money, but has no research or experimental goal, would not satisfy this
8   requirement [that the project has a research or demonstration value.]")  Here, the cost-
9   saving measures are identified as a means to continue providing medical benefits that the
10  state would otherwise have to cut due to budgetary concerns.  *See* Doc. 32-1 at 5; AR
11  000003.  This is relevant to whether the project as a whole furthers the goals of the
12  Medicaid Act.

13    Plaintiffs ask the Court to take judicial notice of a June 2012 report from
14  AHCCCS to the Arizona State Legislature showing that AHCCCS had a budget surplus
15  of $167 million for fiscal year 2012 as evidence that the heightened and mandatory
16  copayments were not needed for Arizona to continue offering medical coverage to the
17  childless adult population.[7]  Doc. 77.  This evidence is irrelevant to the Secretary's
18  decision to approve the copayments in October 2011 because it predates that decision by
19  eight months and was not part of the information before the agency at the time of the
20  Secretary's decision.  As Plaintiffs note, the record contains a March 31, 2011 letter from
21  the Governor of Arizona stating that despite deep budget cuts in almost every other area,
22  the State's Medicaid expenditures had increased by 65 percent over the past four years

---

23
24        [7] In response, Defendant Betlach requests judicial notice of documents showing
    that as of May 5, 2012, AHCCCS was running a projected deficit of more than $167
25  million, and that the problem was remedied by a number of factors, including
    supplemental appropriations of the state legislature, changes in enrollment trends, delays
26  in CMS approval of certain programs, and the receipt of tobacco settlement funds.
    Doc. 80 at 2.  Director Betlach also points to A.R.S. § 35-190A which provides that any
27  agency budget surpluses revert to the general fund at the close of the fiscal year, meaning
    that AHCCCS surpluses are not available to assist the childless adult population.  *Id.* at 2-
    3.
28

and that changes in the program were needed "to assure its future sustainability." Doc. 71, ¶ 25; AR 004219.  The Governor's amended waiver request refers to "Arizona's unprecedented budget crisis" and explains that changes such as payment innovations are needed to "allow the State to manage its Medicaid program within budgetary constraints."  AR 004223.

The Secretary argues that in light of Arizona's budgetary constraints, and because the demonstration project provides benefits that the childless adult population would not otherwise have had, it was reasonable for the Secretary to conclude that the objectives of the Medicaid Act would best be served by offering continued coverage to this population even if it meant imposing higher copayments.  Doc. 30 at 17-18.  As the Ninth Circuit stated in *Spry*, "[p]eople in the expansion population are not made worse off by inclusion in a demonstration project less favorable to them than to the categorically and medically needy because, without the demonstration project, they would not be eligible for Medicaid at all."  487 F.3d at 1276.  The Court agrees that the Secretary could reasonably have concluded that approval of the copayments in lieu of the State's avowed alternatives would help further the purposes of the Medicaid Act.

As with the Secretary's consideration of the project's experimental or demonstration purpose, however, Plaintiffs have presented evidence that the Secretary failed to consider an important aspect of the problem raised by imposing the mandatory copayments.   According to the Ku Declaration that Plaintiffs submitted to CMS, extensive research on cost sharing for the poor has shown that copayments are not an effective Medicaid cost-saving measure for states.  Doc. 76 at 18; *see* AR 003315, ¶ 9.  The research reviewed by Dr. Ku showed, in part, that the imposition of copayments for preventative, primary care leads to low income beneficiaries seeking fewer essential medical services and relying more on emergency room care and hospitalizations, and that higher copayments for prescription drugs cause low income beneficiaries to forgo essential and effective medications, leading to a higher incidence of serious medical conditions such as heart attacks and strokes.  *Id.*; *see* AR 003315, ¶ 10.  Plaintiffs'

counsel also submitted the statements of previous AHCCCS directors noting similar findings and stating that cost sharing is not compatible with managed care which is already designed to reduce costs and to direct participants to the most effective services. Doc. 76 at 19; *see* AR 3351-52, 3355.  Although the approval letter from CMS states that the agency considered how the imposition of mandatory copayments would allow Arizona to cover a higher number of individuals in the expansion population, thus furthering the objectives of the Medicaid Act, the Secretary points to no evidence that the agency considered the corresponding tradeoffs when evaluating the impact of the copayments on those covered by the project or that it made any effort to address Plaintiffs' administrative objections that copayments are not an effective cost saving measure.

### C.     Was the Project Approved for the Extent and Period Necessary?

The Secretary argues that she only approved the copayments for a limited time, ending on December 31, 2013, thus fulfilling her obligation under Section 1115(a)(2)(A) to consider the extent and duration of the project.  Doc. 30 at 16.  Plaintiffs argue that the Secretary failed to meet this obligation because she approved the demonstration project to begin prior to the evaluation being in place, the approval continues beyond the projected time of the proposed evaluation, and the project was approved statewide.  Doc. 76 at 34. Plaintiffs cite no case law showing that a demonstration project or the experimental component of it must be coextensive with the proposed evaluation or that a demonstration project cannot be approved statewide.  In both *Beno* and *Newton-Nations*, the Ninth Circuit declined to address the precise meaning of the "extent and period" language of Section 1115(a)(2)(A), finding that this was not necessary in light of its findings that the Secretary's review of the first two Section 1115 requirements was inadequate.  *See Newton-Nations*, 660 F.3d at 382, n. 3 (citing *Beno*, 30 F.3d at 1072).  In the absence of any authority showing that the Secretary's consideration of this factor was in error, and in light of the statutory language that the approval be "to the extent and for the period *prescribed by the Secretary*," 42 U.S.C. § 1315(a)(2)(A) (emphasis added), the

1    Court is not persuaded that the Secretary's consideration of the extent and duration of the

2    project was arbitrary and capricious.

3         **D.    Summary.**

4         The Court will deny the Secretary's motion for summary judgment on Plaintiffs'

5    first claim for relief on the ground that the Secretary's review of the first two

6    Section 1115 requirements was arbitrary and capricious.

7    **IV.   Plaintiffs' Cross Motion for Summary Judgment.**

8         **A.    Plaintiffs' First Claim for Relief.**

9         Plaintiffs move for summary judgment on their first claim for relief, alleging that

10   the Secretary's approval of Arizona's Section 1115 demonstration project was arbitrary

11   and capricious and exceeded her authority under Section 1115 and § 1396o-1.  Doc. 76;

12   *see* Doc. 1, ¶¶ 94-97.  As previously noted on the basis of *Spry* and *Newton-Nations*, the

13   nominality requirements that Plaintiffs invoke under § 1396o-1 pertain only to

14   mandatory, not expansion populations.  Accordingly, only Section 1115 is applicable in

15   this case.  For the reasons discussed above, the Court will grant Plaintiffs' motion on the

16   ground that the Secretary's review of the first two Section 1115 requirements was

17   arbitrary and capricious and will remand to the Secretary for further consideration of

18   Plaintiffs' objections under these two factors.

19        Plaintiffs ask the Court to vacate the Copayment Rule, but as the Court previously

20   discussed in detail in its order denying Plaintiffs' motion for a preliminary injunction, the

21   copayment provisions approved in this case are not severable from the Secretary's

22   approval of the project as a whole and cannot be vacated separately.  *See* Doc. 88 at 6-

23   10.[8]  Vacating the entire demonstration project would, of course, deny Plaintiffs and the

24

25        [8] Plaintiffs attempt to reopen this issue in their reply brief by distinguishing two of
     the cases the Court cited in its prior order and relying on the Ninth Circuit's remands of
26   distinct provisions in *Newton-Nations* and *Beno* to show that only the copayment
     provision need be remanded or set aside.  Doc. 96 at 8-12.  As the Court has already
27   discussed in detail in this order, the circumstances leading to the Ninth Circuit's remand
     of distinct provisions in *Beno* and *Newton-Nations* do not apply here.  The Court also

28

class the very health benefits they claim to require.  A remand of the Secretary's decision without vacating the project is the clearly preferable alternative and comports with Ninth Circuit precedent holding that agency action in violation of the APA can be left in place during remand "when equity demands."  *Idaho Farm Bureau Found. v. Babbitt*, 58 F.3d 1392, 1395 (9th Cir. 1995); *see also Allied-Signal, Inc. v. NRC*, 988 F.2d 146, 151 (D.C. Cir. 1993) (finding that a decision should remain in place during remand where there is "a serious possibility" that the agency could remedy the alleged APA violation, and "consequences of vacating may be quite disruptive.").

### B.    Plaintiffs' Second Claim for Relief.

Plaintiffs move for summary judgment on their claim that the notices Director Betlach provided regarding the increased copayments fail to comply with due process requirements of the United States Constitution and Medicaid law.  Doc. 76 at 34.  Due process and Medicaid regulations require that a beneficiary of public health benefits receive written notice of the loss of benefits and the opportunity for a hearing if requested.  U.S. Const**.** Amend. XIV; *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970); *Perry v Chen*, 985 F. Supp. 1197, 1202-04 (D. Ariz. 1996).  Medicaid Act regulations specify that the notice must be mailed at least ten days prior to the date of the action and must contain a statement of the intended action, the reasons for the action, the specific regulations or change in federal or state law that require the action, and an explanation of

---

finds Plaintiffs' attempts to distinguish cases in which courts have declined to remand distinct provisions of agency actions unpersuasive.  The legal principle relied upon by those cases and this Court is clear – where there is "substantial doubt" that the agency would have approved the project without the challenged provision, the challenged provision cannot be severed and invalidated on its own.  *North Carolina v. FERC,* 730 F.2d 790, 795-96 (D.C. Cir. 1984).  Plaintiffs argue that the Secretary's statements in the record that rejecting the copayments as part of the overall plan could result in loss of coverage or diminished benefits for Arizona's low-income childless adult population and that the copayments "are not viewed in isolation, but are considered in the context of the Demonstration as a whole," are not sufficient to show the agency's intent to link approval of the program to the copayments.  But the record need only provide "substantial doubt" that the agency would have approved the project without the challenged provision.  *North Carolina,* 730 F.2d at 795-96.  As the Court fully explained in its prior order, such doubt exists in this case.  *See* Doc. 88 at 6-10.

the circumstances under which benefits will remain in place if a hearing is requested.  42 C.F.R. §§ 431.211; 231.210(a)-(c) & (e).  For actions based on a change in law, the notice must "state the circumstances under which a hearing will be granted."  *Id.* at (d).  "The agency need not grant a hearing if the sole issue is a Federal or State law requiring an automatic change adversely affecting some or all beneficiaries."  *Id.* at 431.220(b).

Plaintiffs maintain, and Director Betlach does not dispute, that these notice requirements apply to an increase in copayments because this effectively represents a reduction in benefits.  Doc. 76 at 35-36; *see Becker v. Blum*, 464 F. Supp. 152, 155-56, n.5 (S.D.N.Y 1978) (requiring adequate notices under the Medicaid Act where "[r]ecipients who must co-pay will be receiving 50 cents less aid for each prescription than if they did not have to co-pay."); *Newton-Nations,* 660 F.3d at 383 (holding that constitutional and statutory due process requirements applied to AHCCCS copayment notice).

The notice at issue in this case informs recipients that "[y]ou will have higher co-payments (co-pays) for AHCCCs medical services beginning October 1, 2010 because you are getting AHCCS services in the AHCCCS Care or Medical Expense Deduction (MED) programs."  Doc. 73-2 at 2.  It further explains

> You get services through AHCCS Care because you are an adult who is 1) not pregnant, 2) not 65 or over or 3) not determined disabled, and you do not have an eligible deprived child living with you.  For information on who is considered a deprived child, see Arizona Administrative Code R-22-1427.  If you meet one of the above, contact your local DES office to ask them to review your eligibility.
>
> OR
>
> You get services through MED because
>
> - Your income is too high for any other AHCCCS program, and
> - You have medical costs that, when subtracted from your income, make you eligible for AHCCS.

*Id.*  The notice goes on to explain that "[y]ou will have to pay higher co-pays for some medical services and will need to make the co-pays in order to get the services."  *Id.*  It

then lists the co-pays, informs recipients that they can be denied services for failure to pay, lists categories of individuals, such as "children under 19" or "people determined to be seriously mentally ill," and services, such as "emergency use of an emergency room," for which copayments are not required. *Id.* The notices also provide the legal basis for the decision, citing "AHCCS Rule A.A.C. R9-22-711(F)," and state that "[b]ecause the higher copays are due to a law affecting all members in the AHCCCS Care and MED programs, a hearing is not required under federal law." *Id.* at 3.

Plaintiffs argue that the notices fail to provide sufficient information about the reasons for the action for recipients to determine the accuracy of AHCCCS's decision to apply the heightened and mandatory copayments to them so that they can determine whether or not to contest that decision, fail to provide information about appeal rights, and fail to explain that current copayments would remain in effect during appeal. Doc. 76 at 36.  Plaintiffs also argue that there is no evidence that the notices were timely mailed. *Id.* at 38-39.  The Court finds that each of these arguments lacks merit.

### 1.    Adequacy of Information.

Plaintiffs assert that the notices fail to provide adequate information and could confuse recipients about whether the copayments have been accurately applied to them and whether they should contest the copayment decision.  Plaintiffs argue that the notices do not define "adult" and "deprived child," fail to state where the administrative code defining "deprived child" may be found, and do not explain what "income is too high for any other AHCCCS program."  Doc. 76 at 36.

Plaintiffs seek to turn the notice requirement regarding the copayments into a requirement that AHCCCS fully explain the eligibility requirements for the AHCCCS programs to which the copayments apply.  But the descriptions of the two groups subject to copayments merely refer to assessments AHCCCS made when determining each recipient's eligibility for coverage – assessments the recipient would have been aware of when he or she qualified for benefits.  These assessments have not been changed by the new demonstration project or the Copayment Rule, and do not have any bearing on the

appropriateness of applying that rule to individuals in the two groups at issue where such application was mandated by state law.

To the extent Plaintiffs argue that proper notice must provide sufficient information for a recipient to know whether he or she can be subjected to the new rule, the notice's descriptions of the programs to which the copayments apply, coupled with its enumerations of the categories of individuals and types of services that are exempt, provides such information.  The notice also provides the reason for the action ("due to a law affecting all members in the AHCCCS Care and MED programs") and cites its statutory basis.  Doc. 73-2 at 3.

If Plaintiffs' objection is based, as it appears, on the fact that the notice does not discuss the reasons for the change in state law or the legislative history leading up to that change, Plaintiffs cite no cases dealing with benefits reductions due to changes in law that require such explanations.  This stands to reason because "matters of law and policy are not subject to any hearing requirements under the applicable regulations." *Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978).

In short, Plaintiffs do not show that the notice failed to provide sufficient information for recipients to understand the intended action, including its applicability, the reasons for it, and the law upon which it was based in order to know whether to contest the noticed action.

Plaintiffs' cases are easily distinguishable.  *Rodriguez v. Chen*, 985 F.Supp 1189, 1194-95 (D. Ariz. 1996), found that a notice pertaining to an individual's loss of AHCCCS benefits that merely explained that he was "now in a new category for his age and no longer is eligible due to household excess income," and a notice to a married couple that they were ineligible for Medicaid because their "net income exceeds [the] maximum allowable," without referring to any figures to explain this income determination, were too vague for the recipients to test the accuracy of these decisions.  Unlike *Rodriguez*, there is no individualized assessment at issue in this case, and the notice clearly explained that the increase in copayments was the result of a state law that

applied across-the-board to anyone covered by the two identified programs. Anyone wishing to contest the copayments was given sufficient information to know to whom the copayments applied and to verify the legal basis upon which they were imposed.

*Rodriguez* went on to determine that not all cases require financial calculations and that a sample notice stating that benefits were terminated because quarterly reports had not been received provided all the information a recipient would need to "ascertain whether an error had been made." *Id.* at 1195. The same is true here. The applicability of the copayments to individual beneficiaries depends on readily verifiable facts that either apply or do not apply. As explained above, the notices were not issued to inform recipients of the reasons for their prior coverage determinations, but to inform them of a discrete statutory change in benefits that relates to them as members of one of the two identified AHCCCS programs.

The other cases cited by Plaintiffs deal with notice recipients' inability to evaluate the accuracy of individualized assessments, and do not involve rules that apply categorically based solely on whether the recipient is or is not in a particular program. *See, e.g.*, *Barnes v. Heany*, 980 F.2d 572, 579 (9th Cir. 1992) (notices to custodial parents informing them that they did not receive pass-through child support payments were inadequate because they provided conclusory statements that "any money that was collected was not current support," without providing any information about the collections from which to determine the accuracy of this statement); *Cherry v. Thompkins*, No. C-1-94-60, 1995 WL 502403, *17 (S.D. Ohio Mar. 31, 1995) (notices of termination of care that simply stated "you do not have an appropriate level of care" failed to give factual detail that beneficiaries needed to determine the accuracy of their terminations). These cases have no bearing here, where the notices provided the factual information recipients would need to understand the applicability of and basis for the copayment decision that is the subject of the notice.

### 2. Rights to a Hearing.

The notice informs recipients that "[b]ecause the higher copays are due to a law

affecting all members in the AHCCCS Care and MED programs, a hearing is not required under federal law." Plaintiffs claim that this is incorrect because the copayments are not due to an across-the-board program change; rather, they depend on individual assessments of whether a recipient fits into the programs to which the copayments apply. Doc. 76 at 37. Plaintiffs again conflate the right to challenge individual eligibility assessments with the right to challenge the new demonstration program. The notices were not issued to inform recipients of the reasons for their prior individualized coverage determinations, but only to inform those for whom such determinations have previously been made of changes to their programs. Because these changes are due to state law which applies to "all members in the AHCCCS Care and MED programs," the notices correctly state that "a hearing is not required under federal law." 42 C.F.R. § 431.220(b).

Plaintiffs' cases do not require a different conclusion. In *Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), the state of Colorado passed a law to withdraw optional Medicaid coverage from legal aliens. *Id.* at 1244. The Tenth Circuit found that the notice of this change must inform affected individuals of their right to a hearing because the change in law was not "the sole issue" affecting the benefits cut. *Id.* Rather, application of the law depended on each county completing a process to ascertain which legal aliens were affected by the law and which would remain eligible for benefits. The notices of loss of coverage went to those who "did not provide the required verification of their immigration status to complete the redetermination of eligibility." *Id.* at 1258, 1260. The Tenth Circuit found that whether a person had complied with the redetermination requirements raised a number of factual issues that necessitated the opportunity for a hearing. *Id.* at 1263. Although *Soskin* supports the proposition that public health recipients must be granted a right to a hearing to challenge negative eligibility determinations, no negative eligibility determinations were involved in this case. The notified recipients consisted solely of individuals who were already covered and continued to be covered under existing AHCCCS plans. Nor was a "redetermination of eligibility" required, as it was in *Soskin*, for the state law to take affect with respect to

1  those covered by the affected programs.

2  In *Clause v. Smith*, 519 F.Supp 829, 833 (N.D. Ind. 1981), the court found that a

3  state welfare department was required to afford hearings to individuals affected by new

4  copayment provisions under state law.  But this was because the law required the welfare

5  department to exercise discretion, including whether to exempt certain individuals due to

6  undue hardship.  *Id.*  The court stated that where "no interpretation or discretion [is]

7  required of IDPW by a given state statute, IDPW could satisfy its procedural duties by

8  complying with the notice publication requirement, of 42 C.F.R. s 447.205(d), and the

9  recipient informing requirement, of 42 C.F.R. s 431.210(a), (b), and (c)."  *Id.  Clause* thus

10  supports the conclusion that where, as here, the copayment provisions enacted by state

11  law are not discretionary, but apply equally to all those participating in the identified

12  programs, no individualized hearings are required.

13  *Harriman v. Dep't of Children and Families*, 867 So. 2d 1264 (Fla. App. 2004),

14  held that a recipient of Medicaid services was entitled to a hearing to determine if she

15  qualified for another Medicaid program after she was terminated from her existing

16  program because of a statutory amendment that changed the income requirements for

17  eligibility.  "It [was] clear that appellant was, at least in part, challenging the termination

18  of her benefits for reasons other than the change in law automatically affecting her

19  benefits."  *Id.*  The court found that she was entitled to a hearing "on these issues."  *Id.*

20  The court did not hold that she was entitled to a hearing to challenge the new income

21  requirements imposed by state law, and there was no notice issue raised with respect to

22  the changes in law.  *Harriman* does not apply here because no individualized

23  determinations have been made.

24  *Becker v. Toia*, 439 F. Supp. 324, 331 (S.D.N.Y. 1977), dealt with copayment

25  requirements that were tied to grant recalculations, and the court found that notice and a

26  hearing were required so that the recipients could challenge whether the grant

27  calculations were correct.  No grant calculations are at issue here.

28  *Becker v. Blum*, 464 F. Supp. at 155-56, n. 5, found that hearings were required for

a statutory increase in copayments where exemptions for certain recipients required making individual factual determinations, including whether medical services were required to complete a course of treatment initiated prior to the copayments going into effect.  *Id.*  The court reasoned that hearings were required because "this exemption could produce thorny questions of fact demanding expert medical testimony on what supplies or services are necessitated by a course of treatment beginning before passage of the act." *Id.*  No such individualized factual determinations are required here.

Plaintiffs' remaining cases have little or no bearing on the facts in this case.  *Perry v. Chen*, 985 F.Supp. 1197 (D. Ariz. 1996), involved three plaintiffs who qualified for benefits under various AHCCCS programs.  These individuals never received written notice and an opportunity for a hearing regarding their plans' verbal or telephonic refusals to authorize specific medical services.  *Id.* at 1199-1203.  No change in law was at issue, and the denials of coverage were unique to each individual and not based solely on plan affiliation.  *Id.*

*Cramer v. Chiles*, 33 F.Supp.2d 1342, 1052 (S.D. Fla. 1999), found that a state was required to make hearings available to developmentally-disabled individuals before transferring them from a Medicaid-funded care program that provided institutional care to another program that provided home-based care.  The court found that transfer to a new program implicated the rights of the developmentally-disabled to exercise freedom of choice over services.  *Id.* at 1352.  No such involuntary transfer to a different AHCCCS program is at issue in this case.

Plaintiffs argue that the Copayment Rule is subject to agency discretion because it does not apply to all AHCCCS recipients.  Doc. 76 at 36.  But the fact that the copayments do not apply to members of every AHCCCS program does not mean it is discretionary with respect to the two covered programs, or that individual reassessments are required to determine who was enrolled in these programs at the time the copayments went into effect.

Plaintiffs similarly argue that exceptions to the copayments apply, making their

application subject to factual determinations.  Doc. 91 at 5.  But express exceptions for such things as family planning and emergency use of emergency rooms are clearly identified in the notices, and they apply equally to all program members.  Applying blanket exceptions to a rule does not necessitate individualized hearings.  "While an across-the-board reduction will always raise factual questions about the effect of the reduction on specific individuals, it does not create factual questions as to the reduction itself."  *M.R. v. Dreyfus,* 767 F.Supp.2d 1149, 1167 (W.D. Wash.2011), *reversed on other grounds*, -- F.3d --, 2012 WL 2218824 (9th Cir. 2012).  Plaintiffs' attempt to bootstrap the right to hearings for individual reductions or terminations into an across-the-board right to hearings is not well taken.  "The limitation on the hearing requirement arises out of the practical consideration that, absent some factual dispute about an individual's right to benefits, a hearing would serve little, if any purpose."  *Id.* at 1166.

Plaintiffs have failed to show that recipients of the copayment notices were entitled to a hearing.  The Court therefore need not address Plaintiffs' contention that the notices failed to state that prior copayment terms would remain in effect pending appeal.

### 3.    Timeliness.

Plaintiffs move to strike the Declaration of AHCCCS Operations Manager Diana Alvarez stating that she surveyed the relevant AHCCCS contracted health plans and received confirmation that each plan mailed the notices during the weeks of August 23 or 30, 2010, more than ten days prior to the copayments going into effect on October 1, 2010.  Docs. 90 at 2, 91 at 7; *see* Doc. 84-1, ¶¶ 2-3.  Plaintiffs argue that this evidence is inadmissible hearsay because Ms. Alvarez does not rely on personal knowledge.  Doc. 91 at 7.  In response, Director Betlach asks to withdraw this evidence and has instead provided the declarations of representatives of the eight contracted AHCCCS health plans attesting to the same information provided to Ms. Alvarez and including copies in both English and Spanish of the notices that were sent.  Doc. 100 at 2; 11-54.  The Court accepts this as probative evidence that the notices were timely mailed.

Plaintiffs point to evidence in their supplemental statement of facts that two named

Plaintiffs never received notices.  Doc. 91 at 8; *see* Doc. 92, ¶¶ 86-87.  Plaintiffs argue that they have presented admissible evidence that the copayment notices were not sent timely or at all.  Doc. 91 at 8.  Plaintiffs' rely on the declarations of Cynthia Roberts and Flisha Mumaw that they never received written notice of the copayments.  Docs. 10, ¶ 8, 11, ¶ 9.  But as Director Betlach points out (Doc. 100 at 2), neither of these Plaintiffs claims to have been enrolled in either of the two affected AHCCCS programs at the time the notices were issued in 2010.  Moreover, even if two members of the plaintiff class failed to receive written notice of the copayments, this does not raise a genuine issue of material fact in light of the uncontradicted evidence from representatives of each of the AHCCCS health plans that notices were timely mailed.  Doc. 100 at 11-54.  Plaintiffs' motion for summary judgment on their second claim for relief is denied.

**V.     Director Betlach's Cross-Motion on Plaintiffs' Second Claim for Relief.**

        Director Betlach cross-moves for summary judgment on Plaintiffs' second claim for relief.  Doc. 86.  Director Betlach argues that there is no genuine issue of fact that any member of the plaintiff class found the copayment notices confusing, and the notices complied with the requirements of due process and federal law.  Doc. 86 at 1.  For the reasons discussed in detail above, the Court agrees and will grant the cross-motion.[9]

        **IT IS ORDERED:**

        1.        The Secretary's motion for summary judgment (Doc. 29), is **denied**.

        2.        Plaintiffs' cross-motion for summary judgment (Doc. 67) is **granted** with respect to their first claim for relief and **denied** with respect to their second claim.  The Secretary's approval of Arizona's demonstration project on October 21, 2011 is **remanded without vacatur** for the Secretary to address the deficiencies set forth in this order.  The Secretary shall complete this re-evaluation within 60 days of the date of this

---

[9] The Court will deny Plaintiffs' and Director Betlach's cross motions for judicial notice of documents pertaining to the financial state of AHCCCS.  Docs. 77 and 80.  As noted above, these documents post-date the Secretary's approval of the demonstration project.  Accordingly, the Court finds that they are not relevant to the analysis of whether the Secretary adequately considered the information put before the agency.

order and shall provide copies of the revised analysis to the parties and the Court.  Within 10 days of receiving the revised analysis, the parties shall place a joint conference call to the Court to discuss what, if any, additional action is required in this case.

3.    Director Betlach's cross-motion for summary judgment on Plaintiffs' second claim for relief (Doc. 85) is **granted**.

4.    Plaintiffs' motion for judicial notice (Doc. 77) and Director Betlach's cross-motion for judicial notice (Doc. 80) are **denied**.

5.    Plaintiffs' motion to strike the declaration of Diana Alvarez (Doc. 90) is **denied as moot**.

Dated this 6th day of February, 2013.

_____
David G. Campbell
United States District Judge